## THE PEOPLE OF THE TERRITORY OF UTAH, Ex RELATIONE THE BOARD OF EDUCATION OF SALT LAKE CITY, *v.* UTAH COMMISSIONERS.

ELECTIONS.—EDMUNDS LAW.—RETROSPECTIVE LAW.—The act of congress of March 22, 1882 (the Edmunds Law), which declared vacant all the registration and election offices in Utah Territory, and devolved upon the Utah Commissioners the duty of conducting elections by persons appointed by themselves until the legislature of the Territory should make provision for filling such offices, applied to election offices existing at the time, and not to those afterward created.

STATUTORY CONSTRUCTION—TERRITORIES.—STRICT CONSTRUCTION.—An act of congress which denies to the people of one Territory privileges of local self-government granted to the people of the other Territories, should be strictly construed.

ELECTIONS.—SCHOOL BONDS.—BOARD OF EDUCATION.—Article 15 of act of Utah legislature of March 13, 1890, provides that the mayor and school trustees of each city of the first and second

class shall be a body corporate and authorizes them to call elections to determine whether bonds shall be issued, to give notices thereof, to appoint judges to hold such elections and to receive and canvass the returns thereof; *held*, that this law was valid and not repugnant to the Edmunds Law, declaring election offices vacant.

STATUTORY CONSTRUCTION.—REPUGNANT PROVISIONS.—PARTICULAR CONTROLS GENERAL.—Where the same act contains absolutely inconsistent provisions, the one relating to all school elections and the other to school elections only for the purpose of issuing bonds, the particular provision will control the general, but the latter will stand as to other provisions.

APPEAL from an order and judgment of the district court of the third district refusing a writ of prohibition. The opinion states the facts.

*Messrs. Sutherland and Judd*, for the appellants.

*Messrs. Baldwin and Tatlock*, for the respondents.

ZANE, C. J.:

This was an application based on an affidavit of Richard W. Young, a member of the board of education of Salt Lake City, for a writ of prohibition against the defendants, prohibiting them from publishing a notice of election to decide upon the issuing and sale of bonds to raise money to purchase school-house sites, and for buying and building school-houses, and from appointing judges to hold such election, and from receiving the returns thereof. The district court held that, upon the facts stated in the affidavit, the law did not authorize the issuance of the writ, and the plaintiff appealed to this court. The fifteenth article of an act of the legislature providing for a uniform system of free schools throughout the Territory, in force March 13, 1890, makes the school trustees of each city of the first and second class, together with the mayor thereof, a body

corporate, and invests them with the powers deemed necessary to establish and maintain common schools in the districts embraced in such cities. The city of Salt Lake belongs to the first class. This board is in terms authorized to call elections at which to determine whether bonds shall be issued, to give the notices prescribed to appoint judges to hold such elections, and to receive and canvass the returns thereof. Notwithstanding the provisions of the law referred to, the defendants issued the notice of the election mentioned in the application, appointed judges to hold the same, and required the returns thereof to be made to them as such board. Had that body the power to do so? To answer this question it becomes necessary to interpret section 9 of an act of congress approved March 22, 1882, known as the "Edmunds Law." That section is as follows:

"That all the registration and election offices of every description in the Territory of Utah are hereby declared vacant, and each and every duty relating to the registration of voters, the conduct of elections, the receiving or rejection of votes, and the canvassing and return of the same, and the issuing of certificates or other evidence of election in said Territory, shall, until other provisions be made by the legislative assembly of said Territory, as is hereafter by this section provided, be performed under the existing laws of the United States and said Territory by proper persons, who shall be appointed to execute such offices, and to perform such duties, by a board of five persons to be appointed by the president, by and with the advice and consent of the senate, not more than three of whom shall be members of one political party, and a majority of whom shall be a quorum. The members of said board so appointed by the president shall each receive a salary at the rate of $5,000 per annum, and shall continue in office until the legislative assembly

of said Territory shall make provision for filling said offices, as herein authorized. The secretary of the Territory shall be secretary of said board, and keep a journal of its proceedings, and attest the action of said board under this section. The canvass and return of all votes at elections in said Territory, for members of the legislative assembly thereof, shall also be returned to said board, which shall canvass all such returns, and issue certificates of election to those persons who, being eligible for such elections, shall appear to have been lawfully elected, which certificates shall be the only evidence of the right of such persons to sit in such assembly: *Provided*, that the said board of five persons shall not exclude any person otherwise eligible to vote from the polls on account of any opinion such person may entertain on the subject of bigamy or polygamy, nor shall they refuse to count any such vote on account of the opinion of the person casting it on the subject of bigamy or polygamy; but each house of such assembly, after its organization, shall have power to decide upon the elections and qualifications of its members; and at or after the first meeting of such legislative assembly, whose members shall have been elected and returned according to the provisions of this act, said legislative assembly may make such laws, conformable to the organic act of said Territory, and not inconsistent with other laws of the United States, as it shall deem proper concerning the filling of the offices in said Territory declared vacant by this act."

The connection of the provisions of this section bearing upon the question under consideration will be more apparent if other portions of it are omitted. Without such parts the section would read: "All registration and election offices   *   *   *   are declared vacant, and   *   *   *   every duty relating to registration,   *   *   *   the conduct of elections, the receiving of

votes, their canvass and return, and the issuing of
*  *  *  evidence of election, shall, until  *  *  *
provision  *  *  *  made by the legislature as by
this section provided, be performed under existing laws,
*  *  *  by persons appointed by  *  *  *  a
board of five persons,  *  *  *  who "shall continue
in office until the legislature  *  *  *  shall make
provision for filling said offices, as herein authorized.
*  *  *  Said legislature may make such laws
*  *  *  as it shall deem proper concerning the
filling of the offices declared  *  *  *  vacant by
this act." This section declared all the election offices
of the Territory vacant, and provided that the duties
belonging to them should be discharged by persons
appointed by the board, until legislators chosen at an
election held by such persons should enact laws by which
they could be filled. The board was authorized to
appoint persons to execute the offices made vacant by
the first clause of the section and none other. In the
use of the language, "all the registration and election
offices of every description in the Territory of Utah are
hereby declared vacant," did congress intend only such
as were then in existence, or did it also mean new
election offices, created by a legislature chosen by an
election held by persons appointed by the board provided
in the section? Such a legislature, eight years after the
ninth section took effect, provided for the creation of
the corporation called the "Board of Education of Salt
Lake City," and gave it power to call elections, to vote
on the issuance and sale of bonds, and to appoint judges
thereof, and to receive and canvass the returns. Such
board, and the judges appointed by it, were given all
authority necessary to such elections. If the power given
and the duties specified with respect to such elections
constitute election offices, then they are new ones, and

of a corporation brought into existence eight years after the act of congress in question took effect.

At the time the act of congress under consideration took effect, election offices existed in the various counties and municipalities in this Territory. A portion of the language of the first sentence of the ninth section, considered alone, would indicate an intent to empower the board to appoint persons to execute the duties of election offices that might afterwards be made as well as those then existing. But the other language connected with this, found in the section declaring the offices vacant, and giving the board the power to appoint until other provision be made by the legislature for filling the offices declared vacant, and requiring the performance to be under existing laws, should be considered with it. The offices which the board known as the "Utah Commission" was authorized and required to appoint persons to execute were those offices which the legislature was authorized to provide by law for filling, and they were the ones made vacant by the first clause of section 9. The election offices created by the legislative enactment of March 13, 1890, were not made vacant by the ninth section of the act of congress of March 22, 1882. The latter section was designed to vacate the offices then in existence, not to prohibit any legislature, whose members might be selected at elections conducted by persons appointed by the board, from making laws by which such vacant offices might be filled. The persons filling the election offices at the time the act of congress took effect were deemed unsuitable, and the law for filling them then in force were believed to be objectionable. To remove and replace such unsuitable election officers, and to render nugatory such objectionable laws, was the purpose of section 9. So far that section evinced an intention to deny to the people of the Territory to which

it applied, for a time, the right to have their election offices filled by persons selected by them, or the right, through their legislature, to provide by law for filling them.  Only to that extent does the section limit the political action of the people of the Territory, or the political action of the counties or other municipalities in its borders with respect to their local affairs.  Doubtless the belief of congress was that the public good demanded that the people of this Territory should, for a time, be deprived so far of the principle of local self-government. enjoyed by the citizens in the other Territories and in the States.  A law denying to the people of one Territory privileges extended to all the others should be strictly construed.  We are of the opinion that the section above quoted did not give the defendants the power to call the election to vote on the issuance of school bonds, and the sale thereof, or to appoint the judges of such election, or to receive or canvass the returns.

Reference has been made to section 23 of an act of congress in force March 3, 1887.  This section, in effect, merely requires the laws enacted by this Territorial legislature, mentioned in the section above quoted, to be approved by congress before taking effect.  Our attention has been also called to an irreconcilable repugnancy between certain provisions of sections 102 and 103 of article 15 of an act of the Territorial legislature (Sess. Laws 1890, p. 128), relating to elections to determine whether bonds shall be issued and sold, and sections 122–125 of the same act.  The two sections first mentioned contain, among others, the following provisions: That "fifteen days before an election for school trustees for levying taxes, for voting on the issue of bonds, or for any other purpose named in the article, the city councils of the several cities shall appoint from each municipal ward three judges of such election." These sections also

require the elections to be held in the municipal wards of the city at the time and place designated in the notice. Section 122 provides that the board of education may, when in their judgment it is advisable, call a meeting, and submit to a vote of the district the proposition to issue and sell bonds to raise money to purchase school-sites, to purchase or build school-houses. Sections 123 and 124 are as follows: "The meeting provided for * * * shall be called by publishing a notice signed by the president and clerk of the board of education. * * * Such notice shall contain—*First,* the time and place of holding such election; *second,* the names of three judges to conduct the same; *third,* the hours during the day (naming not less than eight hours) for which the polls will be open; *fourth,* the amount and denomination of the bonds, the rate of interest, and the number of years, not exceeding twenty, the whole or any part of said bonds are to run; *fifth,* for what purpose it is proposed to issue the bonds." "The board of education shall appoint three judges to conduct the election. * * * At such elections the ballots shall contain the words 'Bonds,—Yes,' or 'Bonds,—No.'"

Section 125 requires the returns to be canvassed by the board of education, and makes it the duty of that body to file with the clerk of the county a certified copy of the order of the board, and of the notice, and an affidavit showing when and where published, and also a statement showing the number of inhabitants, and the value of the taxable property in the district, and that the amount of bonds proposed to be issued does not exceed two per cent. of the value of such taxable property, and also facts showing that all matters in relation to the issue thereof were lawfully conducted. Sections 102 and 103 provide for calling and holding elections to vote for trustees, levying taxes, and other elections, as well as

those for voting on the issuance and sale of bonds. Their provisions are more general, while those sections making it the duty of the board of education to call the elections, appoint the judges, canvass the returns, and make certificates, etc., are very specific. They provide alone for elections to vote on propositions to issue and sell[1] bonds. They evince greater care in their preparation and more deliberation than the sections first referred to, so far as they relate to the issuance and sale of bonds. To hold that the latter govern elections to vote on the issue and sale of bonds does not invalidate sections 102 and 103, so far as they provide for elections other than to vote on the proposition for the issue and sale of bonds. The intention of the legislature is clear when all the provisions of the act relating to such elections are considered together. It is that these sections were intended to provide for holding all other elections mentioned in them except the one relating to bonds. As to the provisions relating to all other elections, there is no conflict between the two sections. And the provisions relating to the other elections do not depend on those relating to elections for the issuance and sale of bonds. The latter may fall and the former stand. The provisions of sections 102 and 103 may stand, so far as they are not in conflict with the more special provisions of sections 122–125. The provisions of the first two sections, so far as they relate to elections to vote on the issuing and sale of bonds, and no further, are repealed by the latter sections. Suth. St. Const. § 160; End. Interp. St. § 216. The court holds that the election to decide upon the issuance and sale of the bonds in question should be called and conducted according to the provisions of sections 122–125, above referred to. And we further hold that the qualifications of voters must be determined by the laws of the United States, when any conflict arises

between them and the laws enacted by the Territorial legislature. We are of the opinion that the judgment appealed from is erroneous. Judgment reversed.

MINER, J., and BLACKBURN, J., concurred.